IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIK HEITZENRATER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| CITY OF PITTSBURGH, | ) | |
| BRIAN MARTIN, | ) | |
| DAVID HONICK | ) | |
| BRIAN BURGUNDER, and | ) | |
| DAVID LINCOLN, | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**COMPLAINT**

AND NOW, comes Plaintiff ERIK HEITZENRATER, by and through his attorney, Martin A. Dietz, Esquire, and submits the following Complaint and in support thereof avers as follows:

PLAINTIFF'S FRCP 8 STATEMENT OF THE CLAIM

On October 12, 2018, Defendant Brian Martin, a detective and Pittsburgh police force veteran was videotaped violently assaulting the Plaintiff. This lawsuit alleges that at the time of the assault, Defendant Martin, Defendant David Honick (a detective and Pittsburgh police force veteran with a documented history of abusive conduct toward citizens and fellow officers), Defendant Brian Burgunder and Defendant, David Lincoln, were acting in a professional undercover capacity as detectives with the City of Pittsburgh, Bureau of Police. All four detectives arrived at Kopy's Bar some time prior to 7:33 p.m. on October 11, 2018. They were in Kopy's Bar in the Southside section of the City of

Pittsburgh consuming excessive amounts of alcohol while sitting at the corner of the bar in the front area of the bar. At approximately 11:40 p.m., Plaintiff and his friends entered Kopy's Bar. Plaintiff and his friends walked to the rear area of the bar and played pool. At some point, Defendant Martin and Defendant Burgunder walked to the rear area of the bar and confronted Plaintiff and his friends. Defendants Martin and Burgunder returned to the front area of the bar and continued to consume alcohol. At approximately 12:33 a.m. on October 12, 2018, Defendant Honick, who was extremely intoxicated, began glaring at two of Plaintiff's friends (Frank Deluca and Michael Zokaites) who were standing at the bar near the middle of the bar area. Plaintiff and one of his friends, Bruce Thomas, remained toward the rear of the bar area and had no contact with the detectives. Despite being highly intoxicated and, while he was glaring at them, Defendant Honick began flashing a firearm that was tucked in his waistband to Deluca and Zokaites. In an effort to stop the confrontation, Deluca told Defendant Honick to leave the bar and Defendant Honick, who continued to have his hand on his firearm, told Deluca he would not leave. Fearing for his safety, Deluca pushed Defendant Honick away from him as two unknown uniformed police officers walked into the bar. At this point, Defendants Honick, Martin, Burgunder and Lincoln attacked Deluca and Zokaites. A uniformed officer tased Zokaites and he was taken into custody. Defendants Honick, Martin, Burgunder and Lincoln then participated in a savage beating of a defenseless Deluca while the two uniformed officers stood by and did not stop it.

At some point, Defendants Martin and Honick turned their attention toward Plaintiff. Plaintiff had absolutely no previous aggressive interaction with any of the

undercover detectives and they were sitting at a table toward the middle of the bar. Defendant Honick aggressively squared toward Plaintiff and Plaintiff put both of his hands in the air indicating he had no intention of fighting and he clearly showed his left hand was in a splint as a result of having previously sustained a broken hand. Defendant Honick turned away from Plaintiff without hitting him. Defendant Martin, however, with no provocation, twice violently punched Plaintiff in the head, sending Plaintiff to the ground. At no time prior to the assault did the detectives identify themselves as police officers nor did they tell Plaintiff or any of his friends that they were under arrest. At no time did Plaintiff engage in any aggressive actions nor did he pose a threat of harm to anyone.

Defendant Martin followed his unprovoked attack on Plaintiff by participating in the filing of false felony criminal charges against Plaintiff. Approximately 11-12 hours after the assault on Plaintiff, Defendant Burgunder prepared a false Affidavit of Probable Cause in support of a Police Criminal Complaint charging Plaintiff with felony criminal charges of aggravated assault, riot and criminal conspiracy. The affidavit attributed conduct to Plaintiff that absolutely did not occur and has been borne out by digital video surveillance. As a result of the filing of the false criminal charges, Plaintiff was incarcerated. On November 14, 2018, the District Attorney of Allegheny County withdrew all criminal charges against Plaintiff.

This lawsuit contends that the conduct of Defendants Martin, Honick, Burgunder and Lincoln was part of a pattern and practice of City of Pittsburgh Police officers, who are sometimes intoxicated, unnecessarily escalating interactions with citizens using

excessive force where minimal or no force is needed and then intentionally fabricating false criminal charges against their victims to cover up or justify their actions. This lawsuit further contends that Defendant Martin's unprovoked attack on Plaintiff was the direct result of the City of Pittsburgh's knowledge of and failure to address this routine conduct by its officers. The City of Pittsburgh was aware of numerous specific instances of this type of conduct by its police officers, including Defendants, and not only failed to take disciplinary or remedial action, but in many instances rewarded the officers with promotions, all in violation of 42 U.S.C. §1983.

The Plaintiff's constitutional claims are brought pursuant to the 4th amendment protecting citizens from unreasonable searches, seizures, excessive force, and the filing of false criminal charges, and pursuant to the 14th amendment, protecting citizens from the government's deliberate indifference to the violation of citizens' constitutional rights. Plaintiff also asserts common-law and state court tort claims against Martin, Honick, Burgunder, Lincoln. Plaintiff also seeks injunctive relief.

## JURISDICTION

1. This Court has jurisdiction over the Plaintiff's claims against the above-referenced Defendants pursuant to 28 U.S.C. §1343, and/or 28 U.S.C. §1331. This court has pendent jurisdiction over Plaintiff's common law claims.

## PARTIES

2. Plaintiff, Erik Heitzenrater, is an adult individual residing in

Allegheny County within the Commonwealth of Pennsylvania and the Western District of Pennsylvania.

3. The City of Pittsburgh is a municipality within the Commonwealth of Pennsylvania with a principal place of business located at 414 Grant Street, Pittsburgh, Pennsylvania 15219, which, at all times relevant hereto, was authorized to and did operate and maintain a police department.

4. At all times relevant hereto, Defendant City of Pittsburgh was acting by and through its duly-authorized agents, employees and/or assigns, its appointed Bureau of Police, Chiefs of Police, and Command Staff officials, including Deputy Chiefs, Assistant Chiefs and Commanders who were then and there acting in accordance with custom, policies and/or practices of the City of Pittsburgh Bureau of Police and who were acting within the course and scope of their employment and under the color of state law.

5. At all times relevant hereto, and prior to the events in this case, the Defendant City of Pittsburgh was on notice of repeated instances of City of Pittsburgh police officers using unnecessary and/or excessive force, and then initiating false criminal charges to justify the use of such force and/or otherwise filing false Affidavits of Probable Cause, including prior instances by Defendants Honick, Martin, Burgunder, Lincoln and others and/or their subordinates, and despite such knowledge failed to take appropriate action, including but not limited to, referral for criminal prosecution, appropriate discipline, and/or retraining.

6. Defendant Martin is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then

and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh. This Defendant is sued in his individual capacity.

7. Defendant Honick is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh. This Defendant is sued in his individual capacity.

8. Defendant Burgunder is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh. This Defendant is sued in his individual capacity.

9. Defendant Lincoln is an adult individual residing in the City of Pittsburgh, who at all times relevant hereto, was acting under color of state law in his capacity as a City of Pittsburgh Police Officer and/or Detective, who was then and there acting in accordance with the custom, policies and/or practices of the Defendant City of Pittsburgh. This Defendant is sued in his individual capacity.

## FACTUAL ALLEGATIONS

10. On the evening of October 11, 2018, and the early morning of October 12, 2018, Plaintiff was at Kopy's Bar in the Southside Section of the City of Pittsburgh with friends Frank Deluca, Michael Zokaites, Bruce Thomas and two other persons.

11. Deluca and Zokaites entered Kopy's Bar at approximately 11:41 p.m. on October 11, 2018. They walked up to the bar area and each of them ordered a drink.

12. As Deluca and Zokaites entered Kopy's Bar, Defendants Martin, Honick, Burgunder and Lincoln were seated at the corner of the bar near the front door of the establishment.

13. Defendants Martin, Honick, Burgunder and Lincoln had been in Kopy's Bar consuming alcohol from as early as 7:33 p.m on October 11, 2018.

14. As Deluca and Zokaites were ordering drinks, Defendant Honick turned to his right and looked at them.

15. Defendant Honick leaned back on his bar stool and specifically looked at the back of the vests Deluca and Zokaites were wearing and he noticed the vests were associated with the Pagan's Motorcycle Club.

16. From that point forward, Defendant Honick appeared to have some sort of fascination with Deluca and Zokaites.

17. After obtaining their drinks, Deluca and Zokaites walked to the rear of the bar to a back room to play pool.

18. Within a minute, Plaintiff walked into Kopy's Bar, ordered a drink.

19. Defendant Honick looked at Plaintiff and his vest and then turned toward Defendants Burgunder, Martin and Lincoln and said something to them.

20. Within a minute, two other friends of Plaintiff wearing vests similar to those worn by Plaintiff, Deluca and Zokaites walked into Kopy's Bar and ordered drinks. Plaintiff walked to the rear of the bar to a back room to play pool with Deluca and Zokaites.

21. Defendant Honick then attempted to make conversation with

Plaintiff's two friends that were ordering drinks. Defendant Honick shook hands with these friends and began a brief conversation that lasted a few minutes.

22. At approximately 11:46 p.m., Bruce Thomas walked into the bar and stood near the other two friends who were speaking with Defendant Honick.

23. Shortly thereafter, Thomas and Plaintiff's other two friends walked to the rear back room of Kopy's Bar to play pool. The Plaintiff and his friends were alone in the back room at this time.

24. Between 11:48 p.m. on October 11, 2018 and 12:31 a.m. on October 12, 2018, Plaintiff and his friends remained in the rear area of the bar, keeping to themselves.

25. At approximately 12:21 a.m., Defendant Honick stood up from his bar stool up and reached across to the bartender by grabbing the back of his head and pulling the bartender's head toward his mouth.

26. Defendant Honick at this time quietly advised the bartender that he and Defendants Martin, Burgunder and Lincoln were police officers and there was going to be a problem with Plaintiff and his friends because they were members of the Pagan's Motorcycle Club and he (the bartender) didn't understand what was going on inside the bar.

27. Defendant Honick falsely told the bartender that Plaintiff and his friends were staring at Defendants Honick, Burgunder, Lincoln and Martin. The bartender responded to Defendant Honick that Plaintiff and his friends weren't causing any trouble and he didn't witness any pointing or staring.

28. After his conversation with the bartender, Defendant Honick appeared agitated and continued to rub his face.

29. At approximately 12:22 a.m. Defendant Martin and Defendant Burgunder

went into the bathroom of the bar.

30. At approximately 12:23 a.m. Zokaites walked to the middle bar area and ordered another drink. He immediately returned to the rear bar area without speaking to any of the detectives.

31. At approximately 12:24 a.m., Defendants Martin and Burgunder exited the bathroom. Upon leaving the bathroom, Defendant Martin walked to the rear area of the bar and began to speak with Plaintiff's friends. Defendant Burgunder returned to his seat at the bar.

32. Defendant Martin shook hands with Plaintiff and his friends. Immediately after shaking their hands, he raised both of his hands in the air and walked back to his seat at the bar. On his way back to his seat, he again raised his hands and made a gesture as though he was exhibiting a sign of strength.

33. Less than a minute after leaving the rear area of the bar, Defendant Martin immediately went back to that area. He again shook hands with a few of Plaintiff's friends and engaged in some conversation.

34. Defendant Burgunder followed Defendant Martin to the rear area of the bar. Defendant Burgunder took a seat near the rear area of the bar and monitored Defendant Martin's conversation with Plaintiff's friends.

35. One of Plaintiff's friends briefly joined Defendant Burgunder and had a brief conversation.

36. Defendant Burgunder was joined by Defendant Lincoln near the rear area of the bar as they stood in close proximity to Defendant Martin.

37. At approximately 12:28 a.m. Defendant Burgunder joined Defendant

Martin in the rear room of the bar and conversed with Plaintiff and his friends.

38. At approximately 12:29 a.m., Defendant's Martin, Lincoln and Burgunder returned to the front area of the bar near the seats they had been originally sitting in.

39. At approximately 12:31 a.m., two of Plaintiff's friends left the bar and did not return. One of them waved to the undercover detectives on his way out of the bar. A few of the undercover detectives waved back.

40. At approximately 12:32, Deluca and Zokaites, walked to the middle area of the bar. Deluca was on the telephone at this time.

41. Deluca and Zokaites walked outside so Deluca could finish his telephone call.

42. As Deluca and Zokaites walked toward the middle area of the bar, Defendant Honick stood up from his bar stool. He was unsteady on his feet and held onto the bar to help him stand.

43. Deluca and Zokaites returned to the bar.

44. Deluca was looking at his phone as he walked back into the bar.

45. At approximately 12:33 a.m., Deluca and Zokaites walked back into the bar and stood at a table in the middle bar area.

46. Defendant Honick turned toward Deluca and Zokaites and began staring at them.

47. Defendant Martin, for the third time, approached one of Plaintiff's friends, this time Zokaites, and shook his hand. Martin was somewhat animated and again raised his hands above his head.

48. As Defendant Martin walked away from Zokaites, Defendant Honick

turned and began staring directly at Zokaites.

49. Zokaites stood next to Deluca who was preoccupied on his cell phone.

50. Zokaites walked back to the rear area of the bar.

51. Zokaites shortly returned to the middle area of the bar.

52. At approximately 12:35 a.m., Deluca and Zokaites returned to the rear area of the bar without having any interaction with Defendant Honick.

53. Between approximately 12:33 a.m. and 12:35 a.m., Defendant Honick stared at Deluca and Zokaites.

54. At approximately 12:34 a.m., Defendant Lincoln left the bar and went outside.

55. After Deluca and Zokaites walked to the rear of the bar, at approximately 12:36 a.m., Defendant Honick conversed with the bartender in an animated manner and repeatedly and aggressively gestured toward Plaintiff and his friends in the rear of the bar.

56. At approximately 12:36 a.m., Deluca and Zokaites returned to the middle area of the bar.

57. Immediately, Defendant Honick turned directly toward Deluca and Zokaites from a distance of a few feet away, lifted his shirt and intentionally exposed a firearm to Deluca and Zokaites that was tucked into his waistband.

58. Deluca and Zokaites tried to ignore Defendant Honick but Defendant Honick began speaking directly to Deluca and Zokaites in an aggressive fashion and he continued to exhibit his gun to Deluca and Zokaites.

59. For the first time, at approximately 12:37 a.m. Deluca and Zokaites responded to Defendant Honick.

60. At approximately 12:37 a.m., Defendant Lincoln returned to the bar and covertly handed a loaded handgun magazine to Defendant Burgunder.

61. At this time, Detective Lincoln placed a handgun in his waistband or rear pocket.

62. At approximately 12:39 a.m., Defendant Lincoln intervened and attempted to calm Defendant Honick. Detective Lincoln extended his hand and shook Deluca's hand.

63. Deluca attempted to shake Defendant Honick's hand. At first, Defendant Honick did not want to shake but he eventually did shake Deluca's hand again.

64. At approximately 12:39 a.m. Plaintiff and Thomas walked from the rear bar area and took a seat at a table in the middle area of the bar.

65. As of 12:39 a.m., neither Plaintiff nor Thomas had any aggressive contact with any of the Defendants throughout the entire evening of October 11, 2018 or the early morning hours of October 12, 2018.

66. Immediately after shaking Deluca's hand, Defendant Honick continued to argue with Deluca while having his hand on his gun.

67. Defendant Honick continued to get animated with Deluca.

68. At approximately 12:40 a.m., all four Defendant stood next to each other blocking the front door of the bar.

69. Defendant Honick continued to argue with Deluca and Detective Martin began yelling in the direction of Deluca and Zokaites.

70. At approximately 12:40 a.m., Defendant Honick placed his hand on Deluca's vest while yelling at him.

71. At approximately 12:41 a.m., Defendant Honick again placed his hand on

Deluca's vest while yelling at him.

72. At approximately 12:42 a.m. Deluca and Defendant Honick faced off and began yelling at each other.

73. Immediately thereafter, two uniformed police officers walk into Kopy's Bar and walked right by Defendant Honick and Deluca as they were yelling at each other.

74. Just as the officers enter the bar, Deluca pushed Defendant Honick away from him.

75. At this point, Defendant Martin immediately grabbed Deluca by his hair and began pulling it.

76. At the same time, Defendant Burgunder and a uniformed officer also grabbed Deluca and attempted to pin him against the bar.

77. After being pushed, Defendant Honick stumbled and fell to the floor.

78. As Defendant Honick got back on his feet, a uniformed police officer attempted to grab him and pull him away from the melee that had developed.

79. Instead of complying with the uniformed officers, command, Defendant Honick pushed the uniformed officer away from him and joined the assault of Deluca.

80. Zokaites attempted to come to Deluca's aid. He was, however, quickly tased and he fell to the ground.

81. After Zokaites fell to the floor, he yelled that he was "done" and he did not further participate in the altercation.

82. However, Defendant Martin began punching Zokaites as he was on the ground.

83. Defendant Martin then turned his attention to Thomas, who was standing

near a table.

84. Defendant Martin grabbed Thomas screaming "get out of here bitch" and he threw Thomas into some bar stools.

85. While Deluca was being assaulted by Defendant Lincoln and Defendant Burgunder, Defendant Honick approached Plaintiff who was standing next to the table at which Plaintiff had been sitting.

86. Defendant Honick squared off toward Plaintiff and raised his hand as though he was going to punch Plaintiff.

87. Plaintiff raised his hands above his head displaying the fact that his left hand was in a splint and indicating that he did not want to fight Defendant Honick.

88. Defendant Honick turned away and began punching Deluca along with Defendant Lincoln while Deluca was being restrained by Defendant Burgunder.

89. At approximately 12:42 a.m., Defendant Martin rushed toward Plaintiff and without any provocation yelled "and fuck you too" and violently punched Plaintiff two times in the head.

90. Plaintiff immediately fell to the ground.

91. Uniformed officers approached Defendant Martin immediately after he punched Plaintiff the second time.

92. Defendant Martin began yelling "I'm a cop! I'm a cop!" to the uniformed officers.

93. While Plaintiff was lying on the ground with his hands in the air, Defendant Martin hovered over Plaintiff yelling at him and screaming "man, you're a fucking bitch! You're a fucking bitch".

94. Plaintiff told Defendant Martin "I didn't do nothin'".

95. Defendant Martin responded by falsely claiming Plaintiff grabbed him yelling "Yeah you did! Fuckin' grab onto me again!"

96. Plaintiff responded by telling Martin that he didn't touch him.

97. Defendant Martin responded by saying "the fuck you didn't".

98. Defendant Martin ordered Plaintiff to roll over.

99. Plaintiff responded by telling Defendant Martin that he had a broken hand.

100. Defendant Martin responded by yelling "I don't give a fuck" and he forcefully grabbed Plaintiff and rolled him over.

101. While Plaintiff was lying on the ground, Defendant Martin then grabbed Thomas and, without any provocation, again threw him violently to the ground.

102. Video surveillance clearly shows that Plaintiff never grabbed Defendant Martin, or anyone else or that Plaintiff engaged in any aggressive behavior on October 12, 2018.

103. Defendant Martin grabbed Plaintiff around his next and threatened him while Plaintiff was lying on the ground in handcuffs.

104. While Defendant Martin was assaulting Plaintiff and Thomas, Defendant Burgunder held onto Deluca while Defendant Lincoln and Defendant Honick began to punch Deluca in the head.

105. While they were assaulting Deluca, a uniformed officer began spraying pepper spray at Defendants Honick, Burgunder and Lincoln.

106. Despite the fact that they were pepper sprayed by uniformed police officers, Defendants Burgunder and Lincoln continued to assault Deluca.

107. Defendant Burgunder restrained Deluca against the bar. Defendant Lincoln then violently punched Deluca approximately 19 times in the head while uniformed officers looked on.

108. During the incident, Defendant Honick attempted to retrieve his firearm from his waistband, however, he appeared too intoxicated to remove the firearm.

109. Additional officers, both uniformed and plainclothes, arrived on scene.

110. Defendant Honick was then restrained as he was staggering and attempting to stand.

111. One of the additional officers, a plainclothes officer, joined in the assault of Deluca and began kicking him.

112. As Deluca was being assaulted, one of the officers screamed at Deluca to "feel it faggot, feel it!"

113. The first indication that Defendants Martin, Honick, Burgunder or Lincoln were police officers was when Defendant Martin yelled that he was a cop.

114. At the direction of Defendant Martin, uniformed officer then took Plaintiff into custody.

115. Bar patrons recorded various portions of the events of October 12, 2018 on their cellular phones after Plaintiff, Deluca, Zokaites and Thomas were placed in custody, Defendant Martin looked directly into one of the bar patron's cellular phones and drunkenly slurred "I love being a cop."

116. After Plaintiff, Deluca, Zokaites and Thomas were taken into custody, police officers told the owner of Kopy's Bar that the incident occurred because he let "Pagans" in his bar and that he should no longer allow such people in the bar.

117. Between 7:33 p.m. on October 11, 2018 and 12:40 a.m. on October 12, 2018, the following Defendants consumed the following amounts of alcohol while working in an undercover capacity at Kopy's Bar:

> a. Defendant Honick – at least 13 drinks of liquor "on the rocks." The drinks contained double shots of alcohol at a minimum and some of the drinks contained triple shots of liquor;
>
> b. Defendant Martin – at least 14 drinks comprising of a shot of liquor or can(s) of beer or another canned alcoholic beverage;
>
> c. Defendant Burgunder – at least 19 drinks comprising of a shot of liquor, can(s) of beer or mixed drinks containing liquor; and
>
> d. Defendant Lincoln – at least 7 drinks comprising of a shot of liquor, can(s) of beer and/or drinks containing single or double shots of liquor.

118. It is averred, upon information and belief, that Defendants Honick, Martin, Burgunder and Thomas all collaborated after the arrests of Plaintiff, Deluca, Zokaites and Thomas to coordinate false stories to support the excessive forced used against Plaintiff, Deluca, Zokaites and Thomas and to support the arrests of those men.

119. On October 12, 2018, less than 12 hours after the assaults of Plaintiff, Deluca, Zokaites and Thomas, Defendant Burgunder authored a patently false Affidavit of Probable Cause in support of the Police Criminal Complaints filed against Plaintiff, Deluca, Zokaites and Thomas.

120. With respect to Planitiff, the allegations of criminal conduct contained in the Affidavit of Probable Cause were limited to the following false allegations against Plaintiff:

> As Det. Martin was throwing THOMAS to the ground,

> HEITZENRATER pulled Det. Martin off of THOMAS. HEITZENRATER also pulled Sgt. Baker away from the altercation, to assist in freeing THOMAS.

121. At no time did Plaintiff "pull [Defendant] Martin off of Thomas" nor did Plaintiff pull Sergeant Baker away from any altercation.

122. The false Affidavit of Probable Cause that was prepared by Defendant Burgunder was intended to make it appear as if Plaintiff was aggressive and violent toward Defendant Martin and Sergeant Baker, all of which was false.

123. These remaining false allegations set forth in the Affidavit of Probable Cause were intended to make it appear as if Deluca, Zokaites and Thomas were aggressive and violent toward the defendants in this case.

124. These false allegations against Plaintiff were further made for the purpose of justifying Defendant Martin's unnecessary and excessive use of force against the Plaintiff and Plaintiff's false arrest.

125. These remaining false allegations set forth in the Affidavit of Probable Cause were further made for the purpose of justifying the unnecessary and excessive use of force against Deluca, Zokaites and Thompson and their subsequent false arrest.

126. Plaintiff, Deluca, Zokaites and Thomas were all arrested and lodged in the Allegheny County Jail in lieu of a $10,000 bond.

127. At all relevant times, Defendants Martin, Burgunder, Honick and Lincoln were aware that there was a video which recorded the events of October 11, 2018 and October 12, 2018 including, but not limited to, Martin's unprovoked attack on Plaintiff.

128. On October 19, 2018, officials from the City of Pittsburgh Bureau of Police seized the video surveillance hard drive from Kopy's Bar.

129. When officials from the City of Pittsburgh Bureau of Police returned the hard drive to the owner of Kopy's Bar, those officials advised the owner that the hard drive could not be turned on and that the data from the hard drive might be lost.

130. Officials from the City of Pittsburgh were not aware that Plaintiff's legal counsel had already obtained a copy of the video surveillance.

131. It is respectfully averred that representatives from the City of Pittsburgh Bureau of Police intentionally destroyed evidence relating to a criminal case.

132. After the video of the October 11-12, 2018 events surfaced, the Allegheny County District Attorney's Office voluntarily withdrew all charges filed against the Plaintiff, Deluca, Zokaites and Thomas on November 14, 2018.

133. The District Attorney of Allegheny County was interviewed on local media on November 18, 2018 and has specifically stated that he did not believe Plaintiff committed any crimes on October 12, 2018.

134. On October 15, 2018, the Sheriff of Allegheny County, through his Chief Deputy, Kevin M. Kraus, sent Plaintiff a letter advising Plaintiff that his license to carry a firearm was revoked as a result of "a request from the City of Pittsburgh".

135. The letter from the Allegheny County Sheriff's Office informed Plaintiff that his license to carry a firearm was being revoked due to "an incident or encounter that took place on October 13, 2018.

136. Plaintiff was not involved in any "incident or encounter" on October 13, 2018.

137. To the extent that the letter referred to the incident set forth above that occurred on October 12, 2018, the revocation was wholly unwarranted under

the circumstances.

138. While Plaintiff does not know was precise information was supplied to the Sheriff's Office concerning Plaintiff, it is clear that any information supplied to the Allegheny County Sheriff and/or its Chief Deputy Kevin Kraus by "the City of Pittsburgh" was patently false and was intended to deprive Plaintiff of his constitutional right to carry a firearm.

139. Plaintiff did not engage in any conduct that demonstrated he would be likely to act in a manner dangerous to public safety on October 12, 2018 or October 13, 2018.

140. On the contrary, as set forth above, Plaintiff was violently assaulted in an unprovoked attack by a City of Pittsburgh detective.

141. On or about November 23, 2018, after communications between undersigned counsel and the Solicitor for the Allegheny County Sheriff's Office, the Sheriff of Allegheny County agreed to administratively restore Plaintiff's license to carry a concealed firearm.

NOTICE AND ACQUIESCENCE ALLEGATIONS

142. Prior to the events of October 12, 2018, Defendant City of Pittsburgh was on notice that City of Pittsburgh police officers including Defendants had, without cause, escalated nonviolent interactions with citizens resulting in the unnecessary and excessive use of force, sometimes while drinking alcohol to excess. The officers then filed false criminal charges to justify the use of such unnecessary force, and to protect themselves from civil liability, by attempting to obtain plea-bargains in the face of defending against serious, often felony-level, false criminal charges.

143. Despite knowledge of such unconstitutional practices on the part of City of Pittsburgh police officers, Defendant City of Pittsburgh failed to take any action to prevent officers from engaging in such unconstitutional conduct. Officers who had engaged in such practices were not punished and, in many instances, were promoted to a higher rank. Prior to October 12, 2018, Defendant City of Pittsburgh had reason to know and was otherwise on notice of a number of instances where City of Pittsburgh police officers had used unnecessary and excessive force and filed false serious criminal charges to justify such force. Those instances include, but are not limited to, the following instances:

<u>David Williams v. City of Pittsburgh, et al</u>

144. On September 1, 2014, David Williams, a Pennsylvania State Police trooper, was arrested and charged with serious felony offenses, including aggravated assault on police officers.

145. In support of those charges, several City of Pittsburgh police officers, in official documents, including Affidavits of Probable Cause, incident reports, and supplemental reports, made allegations which were later shown to be false by a video which recorded the actual events.

146. At all times relevant, Defendant City of Pittsburgh and/or members of the Command Staff viewed the video and knew that the officers had filed false reports in support of the false charges filed against Williams.

147. At all times relevant, Defendant City of Pittsburgh knew that its officers had obtained a copy of the video but never reported its existence to the Command Staff.

None of the officers who filed false reports and affidavits, etc. and/or who failed to disclose the existence of the video were ever punished or disciplined in any way.

148. Officer Baker was the individual officer who filed the charges against Williams and the false Affidavit of Probable Cause. Instead of being punished, he was promoted to the rank of Sergeant in 2015.

149. The on-scene supervisor of the individual officers involved, Stephen Matakavich, ordered his subordinates to get their "story straight" and failed to disclose the existence of the incriminating video to Command Staff. He was never punished or disciplined for such conduct.

150. Officer Brendan Nee kicked Williams in the groin after he had been subdued and failed to include this information in any of his reports. Rather than disciplining him, his supervisors, directed him to file a "supplemental report" disclosing the kick - more than a year later, after Williams had filed a lawsuit. At that time Nee, for the first time, claimed that he kicked Williams because he believed he had a gun.

151. The officers made false allegations against Williams which were strikingly similar to the false allegations made by Defendants Martin and Burgunder against Plaintiff. No officer was ever disciplined, counselled or retrained or otherwise subjected to any adverse consequences from Defendant City of Pittsburgh as a result of their conduct toward Williams.

Anthony Kenney v. City of Pittsburgh, et al

152. On December 10, 2012, Anthony Kenney was stopped by City of

Pittsburgh police officers, removed from his car and hit repeatedly in the face and head by Officer Matthew Turko, including multiple strikes to the temple with a gun. His partner, Robert Smith watched this occur without intervening. Turko had no reason or justification for such force.

153. Officers Turko and Smith prepared reports falsely alleging that the injuries sustained by Mr. Kenney were the result of extricating him from his vehicle, in the process of which he fell to the ground and struck his head.

154. On July 16, 2014, a jury empaneled in the U.S. District Court for the Western District of Pennsylvania rejected the police officers' false allegations and specifically found that Turko had used excessive force and that Smith had failed to intervene to prevent the use of such force.

155. During the course of the trial, an independent, third-party witness testified that she observed the officers striking Mr. Kenney about the head and face as he alleged.

156. Despite the fact that an independent third-party witness corroborated Mr. Kenney's version of what occurred and despite the fact that a federal jury rejected the Defendant officers' false allegations, neither of the officers were ever disciplined. To the contrary, Turko was promoted to Sergeant on March 3, 2015.

157. At all times relevant, Defendant City of Pittsburgh knew that Smith and Turko had filed false reports, knew that an independent witness contradicted their false version of the events, and knew that a federal jury had rejected their false allegations. Nevertheless, no action was taken against these officers. To the contrary, Turko was rewarded with a promotion less than nine months after the jury rendered its verdict against him.

Taylor Condarcure v. City of Pittsburgh, et al.

158. On February 28, 2010, Taylor Condarcure was seriously injured when he was subjected to excessive force by Defendant Honick, who violently and unnecessarily punched him in the face. Defendant Honick, in order to justify this unlawful use of force, falsely charged Mr. Condarcure with serious criminal offenses, including felony aggravated assault on a police officer.

159. Defendant Honick falsely alleged that the violent use of force was justified because Mr. Condarcure had aggressively shoved him when he refused to leave a nightclub upon Defendant Honick's command.

160. Independent witnesses, unrelated to Mr. Condarcure, reported, however, that Condarcure had not assaulted Defendant Honick as alleged. Prior to trial, the Allegheny County District Attorney's Office withdrew the aggravated assault charges with prejudice.

161. Before the incident involving Taylor Condarcure, the City of Pittsburgh had received numerous complaints of Defendant Honick using excessive force, routinely followed by the filing of serious criminal charges to support such use of force.

162. Former Chief Harper acknowledged in sworn testimony that the City of Pittsburgh was on notice of Defendant Honick's inappropriate use of force, specifically, delivering unnecessary and potentially deadly strikes to the face and head, and that action should have been taken to address it. No such action was ever taken.

163. At all times relevant, although the City of Pittsburgh was on

notice of Defendant Honick's excessive use of force, routinely followed by the filing of serious criminal charges to justify such force, and despite its knowledge that objective witness testimony contradicted his version of events involving Mr. Condarcure, Defendant City of Pittsburgh has never disciplined Defendant Honick for such conduct. To the contrary, Defendant Honick has been afforded preferred assignments and promotions, including secondary employment and assignments to SWAT.

Christine Condarcure v. City of Pittsburgh, et al

164. Following Officer David Honick's use of excessive force against Taylor Condarcure, Taylor's mother, Christine Condarcure, filed a complaint against Defendant Honick with the City of Pittsburgh Office of Municipal Investigations ("OMI"). On May 6, 2010, City of Pittsburgh Police Officer Anthony Scarpine retaliated against Ms. Condarcure for filing this complaint by falsely charging her with resisting arrest and witness intimidation.

165. In support of the charges, Scarpine filed a false Affidavit of Probable Cause containing numerous blatantly-false accusations against Ms. Condarcure. An OMI investigation uncovered surveillance video which demonstrated that the Affidavit of Probable Cause was untrue.

166. In a subsequent lawsuit, additional evidence was disclosed confirming that the Affidavit of Probable Cause prepared by Officer Scarpine contained patently untrue allegations, and that Scarpine, who claimed to have personally observed what was alleged in the Affidavit, was asleep when the alleged events occurred.

167. Despite conclusive knowledge that one of its officers had filed a patently false Affidavit of Probable Cause, neither the City of Pittsburgh Bureau of Police, nor any police official, initiated criminal proceedings against the officer.

168. Officer Scarpine continues to be employed by the Defendant City of Pittsburgh where he was allowed to choose to be assigned to the warrant office where one of his duties is to review criminal complaints for accuracy.

Jordan Miles v. City of Pittsburgh, et al

169. On January 10, 2010, Jordan Miles, was severely beaten by three City of Pittsburgh police officers and falsely charged with serious criminal offenses including, but not limited to, aggravated assault on police officers.

170. In support of the false charges filed against Mr. Miles, the officers made allegations that he "bladed" his body, intentionally elbowed one of the officers in the head and donkey-kicked another officer in the shins.

171. On March 31, 2014, a jury impaneled in the United States District Court for the Western District of Pennsylvania, unanimously rejected the officers' false version of events and found that the officers did not have probable cause to arrest Mr. Miles on the false charges filed against him, including the felony offense of aggravated assault on a police officer.

172. Prior to the civil jury verdict on March 31, 2014, a district magistrate had dismissed the false criminal charges filed against Mr. Miles for lack of probable cause. Despite the fact that a federal civil jury rejected the Defendant officers' false

allegations and found that Mr. Miles' arrest was without probable cause, and despite the fact that the district magistrate judge had thrown the charges out, none of the defendant officers were ever disciplined or punished.

173. In addition, although not admitted into evidence at the time of trial, during discovery, it was disclosed that the defendant officers had engaged in similar conduct numerous times prior to the incident involving Mr. Miles. Despite this evidence, the defendant officers were never subjected to any discipline, retraining, counselling or other administrative action.

174. In addition, although not admitted at the time of trial, a third-party witness reported that one of the defendant officers had used racial slurs to describe Mr. Miles, pointing to racial bias as the reason for beating Mr. Miles. Despite knowledge of these allegations, Defendant City of Pittsburgh made no effort to investigate or otherwise address those allegations.

<u>Daniel Hacket v. City of Pittsburgh, et al</u>

175. On March 15, 2008, Daniel Hackett, a CPA, and an individual who had never been charged with or arrested for any criminal offense, was arrested by City of Pittsburgh Police Officer Edward Cunningham, tasered by that police officer, and subjected to serious false criminal charges, including misdemeanor resisting arrest charges.

176. Officer Cunningham made false allegations to justify his arrest of Mr. Hackett and the excessive and unnecessary use of a taser on Mr. Hackett.

177. On December 4, 2008, Common Pleas Court Judge David Cashman found Mr. Hackett not guilty of the false criminal charges brought against him by Cunningham.

178. Prior to the incident involving Mr. Hackett, the City of Pittsburgh had received other complaints concerning Cunningham's use of unnecessary and excessive force.

179. Hackett subsequently filed civil lawsuit against the City of Pittsburgh and Cunningham, which the City of Pittsburgh settled for the sum of $155,000.00.

180. Despite the fact that Cunningham's version of the events which he alleged to support the charges and the use of force was not credible, and despite the fact that Mr. Hackett was found not guilty, and despite a civil lawsuit which further exposed the lack of credibility in Cunningham's version of the events, Cunningham was never punished, disciplined, counseled or subject to any retraining. Instead, he was rewarded with a promotion to Sergeant following this incident and another to Lieutenant in February, 2015.

Collins v. City of Pittsburgh

181. On September 21, 2006, three City of Pittsburgh Police officers, in plain clothes and driving an unmarked vehicle, improperly initiated a vehicle pursuit of Jeffery Collins for allegedly “splitting lanes” with his motorcycle on Fifth Avenue in Oakland.

182. During the course of the ensuing stop, the officers physically assaulted Collins, slapped him in the chest several times and then swept his legs out from under him while he was handcuffed, causing him to hit his head on a curb, lose consciousness and suffer a seizure.

183. Collins spent several days in the ICU and required knee surgery as a result of the incident. Collins was charged with fleeing and eluding, DUI and several traffic offenses. The fleeing and eluding and DUI charges were dismissed. The traffic offenses were not pursued.

184. During litigation of Collins' civil action, the officers gave sworn testimony which directly contradicted the official incident report, contradicted each other's testimony, contradicted their own prior statements and was inconsistent with the injuries suffered by Collins.

185. Despite conclusive and/or substantial evidence that these officers had violated Bureau policy, used excessive force and filed statements later contradicted by sworn testimony, the City of Pittsburgh did not prosecute, discipline, retrain, counsel or take any action whatsoever against these officers.

Officer Bradley Walker

186. The City of Pittsburgh Bureau of Police employed Police Officer Bradley Walker from 1993 until 2010. During that time, Walker amassed over thirty documented complaints of excessive force. These included, *inter alia*, numerous on and off-duty road rage incidents, as well as allegations that he hit a man so hard that he lost the use of his eye, beat a motorist in the head and placed a gun in his mouth, choked a pregnant women and knelt on her back, hit a juvenile in the head with a gun and reported that the boy had tripped, choked a woman, slammed her to the ground and sexually fondled and groped her, broke a man's ankle by stomping on it during a routine traffic stop, choked his son

and beat his wife.

187. Former Chief of Police, Nathan Harper knew that Walker had a pattern of using excessive force, including choking and strikes to the head, and that his documented uses of excessive force should have resulted in his termination. However, during his seventeen years on the force, the highest level of discipline he received was a one-day suspension.

188. Defendant City Pittsburgh exhibited a pattern and practice of failing to adequately investigate complaints about Walker, failing to keep a record of the investigations it did conduct, failing to impose discipline when use of excessive force was confirmed, and failing to follow through with and/or arbitrarily reducing the severity of discipline of the rare occasions that it was ordered.

189. In May of 2010, the Pennsylvania State Police criminally prosecuted Walker for an off-duty road rage incident in which he sideswiped another motorist's car and then went on a rampage choking the motorist, brandishing his firearm and threatening to shoot him, punching the driver's side, windshield and roof of the motorist's car with his bare fist and gun (cracking the driver-side window and windshield) and waving his firearm and shouting obscenities at other motorists. After the Pennsylvania State Police charged Walker, he was terminated for "conduct unbecoming an officer."

190. Despite knowledge of numerous previous incidents of misconduct and false reports to cover up this misconduct, Defendant City of Pittsburgh made no effort to criminally prosecute, terminate or even seriously discipline Walker until an independent agency stepped in and initiated criminal proceedings.

CAUSES OF ACTION

Count I
Heitzenrater v. City of Pittsburgh
(42 U.S.C. §1983)

191. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

192. Defendant City of Pittsburgh's conduct, as hereinbefore described, violated Plaintiffs' 14th amendment substantive due process rights to be free from arbitrary, capricious, and deliberately indifferent conduct by a governmental entity and/or free from custom, policies, and practices amounting to the deliberate indifference to the violation of citizen's constitutional rights by police officers employed by the City of Pittsburgh. Plaintiff's 14th Amendment substantive due process claims are made actionable against the City of Pittsburgh pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C.§1983.

193. In addition to the loss of his civil rights, as a direct result of the conduct of Defendant, City of Pittsburgh, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

194. Plaintiff also respectfully requests that this Court enter a mandatory injunction requiring the City of Pittsburgh to take immediate remedial action with respect to training and disciplining its police officers to act in accordance with the Constitutional and civil rights, privileges and immunities guaranteed to Ms. Robinson and all citizens of the United States of America by the Constitution of the United States of America and the Constitution and laws of the Commonwealth of Pennsylvania generally and, specifically, that the City of Pittsburgh take immediate steps to develop a policy and educate its on-duty officers about the responsible use of alcohol while on duty and to refrain from conducting investigations while intoxicated.

195. Plaintiff also respectfully requests that this Court enter a mandatory injunction requiring the City of Pittsburgh to take immediate remedial action with respect to training and disciplining its police officers to act in accordance with the Constitutional and civil rights, privileges and immunities guaranteed to Ms. Robinson and all citizens of the United States of America by the Constitution of the United States of America and the Constitution and laws of the Commonwealth of Pennsylvania generally and, specifically, that the City of Pittsburgh take immediate steps to develop a policy and educate its officers while on duty not to engage in excessive force and/or commit assaults on citizens who do not violate the law, file false criminal charges against citizens who do not violate the law, lie on affidavits of probable cause to cause the filing of charges against citizens who do not break the law.

WHEREFORE, Plaintiff requests judgment against the City of Pittsburgh for compensatory damages, the requested injunctive relief and for the recovery of costs and

attorney's fees, punitive damages and such other relief as the Court deems just and equitable under the circumstances.

Count II
Heitzenrater v. Brian Martin and Brian Burgunder
(42 U.S.C. §1983)

196. All preceding paragraphs are incorporated herein as if fully set forth.

197. At all times relevant hereto, Defendants Martin and Burgunder were acting under color of state law individually and/or with the help of or in concert with others who were acting under color of state law. At all time relevant hereto, Defendants Burgunder and Martin deprived Plaintiff of the rights privileges and immunities secured to him by 42 U.S.C. §1983 and by the Fourth and Fourteenth Amendments to the United States Constitution by intending to cause and causing the prosecution of Plaintiff for violating 18 Pa.C.S.A. §§2702, 5501 and 903 on October 12, 2018 when Defendants Burgunder and Martin knew that Plaintiff did not violate those statutes on that day.

198. In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Burgunder and Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against the Defendants Burgunder and Martin for compensatory and/or punitive damages and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count III
Heitzenrater v. Brian Martin
(42 U.S.C. §1983)

199. All preceding paragraphs are incorporated herein as if fully set forth.

200. At all times relevant hereto, Defendant Martin was acting under color of state law individually and/or with the help of or in concert with others who were acting under color of state law. At all time relevant hereto, Defendant Martin deprived Plaintiff of the rights privileges and immunities secured to him by 42 U.S.C. §1983 and by the Fourth and Fourteenth Amendments to the United States Constitution to be free from the excessive use of force and the right to bodily integrity, preservation of personal security and the right to be free from physical assaults.

201. In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess

a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against the Defendants Burgunder and Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count IV
Heitzenrater v. Martin and Burgunder
(Malicious Prosecution – Supplemental Jurisdiction)

202. All preceding paragraphs are incorporated herein as if fully set forth.

203. Defendants Martin and Burgunder engaged in outrageous conduct by initiating and/or procuring the institution of the charges of violating 18 Pa.C.S.A. §§2702, 5501 and 903 on October 12, 2018 without probable cause with malice and primarily for a purpose other than that of bringing Plaintiff to justice and such proceedings were terminated in favor of Plaintiff.

204. In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Martin and Burgunder, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against the Defendants Burgunder and Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count V
Heitzenrater v. Martin
(False Arrest – Supplemental Jurisdiction)

205. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

206. Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights to be free from false arrest.

207. In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against Defendant Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VI
Heitzenrater v. Martin
(Assault and Battery – Supplemental Jurisdiction)

208. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

209. Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights and constituted assault and battery.

210. In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against Defendant Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VII
Heitzenrater v. Martin
(Intentional Infliction of Emotional Distress – Supplemental Jurisdiction)

211. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

212. Defendant Martin's conduct, as hereinbefore described, was outrageous and it violated Plaintiff's Fourth Amendment/common law/state court rights and constituted intentional infliction of emotional distress.

213. In addition to the loss of his civil rights, as a direct result of the conduct of Defendant Martin, as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess

a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against Defendant Martin for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

Count VIII
Heitzenrater v. All Defendants
(Civil Conspiracy – Supplemental Jurisdiction)

214. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

215. Defendants Martin, Burgunder, Honick and Lincoln conspired with each other to commit malicious prosecution, false arrest, assault and battery and intentional infliction of emotional distress as hereinbefore described.

216. The conduct of Defendants Martin, Burgunder, Honick and Lincoln, as hereinbefore described, was outrageous and it constitutes common law/Pennsylvania state court civil conspiracy.

217. In addition to the loss of his civil rights, as a direct result of the conduct of Defendants Martin, Burgunder, Honick and Lincoln as hereinbefore described, Plaintiff suffered the following additional damages:

a. physical injuries in different parts of his body, including his face, head, neck, and back;

b. severe emotional distress, embarrassment, and humiliation;

c. loss of income and loss of employment opportunities;

d. loss of his Second Amendment rights to possess a firearm; and

e. attorneys' fees to defend against the false and malicious charges brought against him.

WHEREFORE, Plaintiff requests judgment against Defendants Martin, Honick, Burgunder and Lincoln for compensatory and/or punitive damages in a sum in excess of $75,000, and for the recovery of costs and attorney's fees, and such other relief as the Court deems just and equitable under the circumstances.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of any and all issues triable of right by trial by jury pursuant to the Seventh Amendment to the United States Constitution, the statutes of the United States of America and Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

s/ Martin A. Dietz .

Martin A. Dietz, Esquire
Pa. I.D. No. 69182

The Mitchell Building
304 Ross Street, Suite 505
Pittsburgh, PA 15219
(412) 261-5520

Attorney for Plaintiff
ERIK HEITZENRATER